# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Cimline, Inc.,

                Plaintiff,
                                     Civ. No. 07-3997 (RHK/JSM)

                                               **MEMORANDUM OPINION**
                                               **AND ORDER**

v.

Crafco, Inc.,

                Defendant.

---

Lauris A. Heyerdahl, Foley & Mansfield, P.L.L.P., Minneapolis, Minnesota, for Plaintiff.

Eric H. Chadwick, Casey A. Kniser, Aaron W. Davis, Patterson, Thuente, Skaar & Christensen, P.A., Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

This is a patent case concerning sealant melters, which are used to seal cracks in pavement. Defendant Crafco, Inc. ("Crafco") is a manufacturer of pavement-maintenance equipment, including sealant melters, and holds United States patent #5,967,375 (the "'375 patent") entitled "Sealant Melter with Retrofittable Sealant Block Feed Assembly." Plaintiff Cimline, Inc. ("Cimline") is one of Crafco's competitors in the sealant-melter market. The parties are old adversaries; in 2000, Crafco sued Cimline for patent infringement in the United States District Court for the District of Arizona regarding a different patent and, from time to time since, has accused Cimline of infringing the '375 patent.

Cimline commenced the present action in 2007. In its Amended Complaint, it seeks a declaration that the '375 patent is invalid or, in the alternative, that its current sealant melter does not infringe the '375 patent. It also alleges unfair-competition and antitrust claims based on Crafco wielding the "invalid" patent. Crafco has counterclaimed, alleging that Cimline's sealant melter infringes. Presently before the Court is Crafco's Motion for Summary Judgment. For the reasons set forth below, the Court will grant the Motion and will also grant summary judgment to Crafco *sua sponte* on its counterclaim.[1]

## BACKGROUND

Sealant melters are used in the maintenance of pavement. Typically, they are mounted on trailers and work by heating – and thus melting – blocks of sealant material in a reservoir tank, which is sometimes called the "kettle." The melted sealant is then dispensed from the tank through a pipe or hose to seal pavement cracks. Generally speaking, sealant melters are used by government agencies or contractors hired by them to maintain roadways.

When sealant melters were first used, moving sealant blocks into the reservoir tank proved difficult. The blocks are large, bulky, and heavy, which made loading them into the tank a labor-intensive task. In addition, the blocks typically were dropped into the

---

[1] Having reviewed the parties' voluminous submissions, the Court concludes that oral argument will not materially assist its resolution of the Motion.

tank from above, causing hot sealant – often over 500° – to splash out, posing a substantial burn hazard to the melter's operators.

In the mid-1990s, Raymond Rugh, the Chief of Specifications for the Pennsylvania Department of Transportation ("Penn DOT"), contemplated a better way to deliver sealant blocks into melters. He theorized that a conveyer belt could be attached to the reservoir tank, which would allow blocks of sealant to be rolled down the belt and dropped into the tank mechanically, rather than by hand. He also envisioned a hinged door on the top of the tank through which the sealant blocks would drop. The door would open as a block fell through and then snap shut, preventing any sealant from splashing out of the tank. (See Rugh Dep. Tr. at 13-16.)

Rugh apparently was not alone. Sometime prior to October 1995, Robert Schegan, the Equipment Manager for Schuylkill County, Pennsylvania, visited Monroe County, another county in his maintenance district, and had seen modifications like those envisioned by Rugh. In particular, he saw that Monroe County had modified its melters by adding manual (i.e., unpowered) conveyor belts and installing extension boxes on top of the reservoir tanks, through which blocks of sealant would pass when falling from the conveyor belt. (Schegan Dep. Tr. at 9-12; see also Rugh Dep. Tr. at 19-20.) The extension boxes contained a hinged door to prevent hot sealant from splashing out of the tanks. (Schegan Dep. Tr. at 30; Rugh Dep. Tr. at 20.) Schegan decided to implement similar modifications to two sealant melters Schuylkill County had previously purchased from Crafco. (Schegan Dep. Tr. at 17.)

3

On October 23, 1995, Tim McKenney, an employee of Crafco's northeast distributor, Artco Equipment Sales, Inc. ("Artco"), traveled to Schuylkill County and observed the modifications that Schegan had made to Crafco's melters. (Heyerdahl Aff. Ex. 10; McKenney Dep. Tr. at 10, 28-30.) He was immediately concerned about them and conveyed his concerns to Artco's President, Eric Stone. (Id. at 11.) Stone then sent a letter to Ron Doemland, Penn DOT's Equipment Division head. (Heyerdahl Aff. Ex. 10.) The letter noted that McKenney had found "a three foot high extension box with a flap welded to the top of the Crafco melter," and that a "conveyor to load boxes of sealant material into the top portal was attached to this extension." (Id.) Stone wrote that Crafco's melters were not built with such modifications in mind and that the top of the melter was "not designed to hold the weight of" the extension box. (Id.) He also noted that the extension box acted like a chimney, reducing the temperature of the reservoir tank and increasing the time necessary for sealant to melt. (Id.) Accordingly, he informed Penn DOT that it would not honor the warranty on the modified melters and it would not be responsible for any injuries resulting from the modifications, and he recommended that Penn DOT discontinue using the modified melters. (Id.) Although not entirely sure, McKenney "thought" that Stone spoke to Crafco about Penn DOT's modifications. (McKenney Dep. Tr. at 11; see also id. at 18.)

In September 1996, Penn DOT had a meeting regarding the modifications described above, which had been in use at that point for more than a year. (See Heyerdahl Aff. Ex. 12; Rugh Dep. Tr. at 16-18.) The meeting was attended by several

4

Penn DOT employees (including Rugh), McKenney, and Tom Kelly, a Crafco sales representative. (See Heyerdahl Aff. Exs. 13-14; Rugh Dep. Tr. at 24-25; Kelly Dep. Tr. at 23.) At the meeting, Penn DOT explained how it had modified its melters and asked Crafco if it could build melters with an "autoloading" system – a powered conveyor belt that would drop sealant blocks through a door into the melter. (Id. at 23, 26-27; Kelly Dep. Tr. at 29, 40.)

On October 3, 1996, Kelly wrote Larry Allen, a Penn DOT equipment manager who had attended the September meeting, regarding Penn DOT's request. The letter stated:

> As we discussed in our meeting, Crafco has now and would be pleased to provide to your department a loading conveyor and hatch to be installed on your melters. This device, shown in the pictures you were provided, is very similar to the attachment that your Field Operations has designed on their own. Per your request, Crafco will evaluate the ability to provide this loading conveyor with a powered belt conveyor.
>
> *          *          *
>
> Although the design of the attachment you showed me was similar to the design that Crafco has available, there are many differences. Crafco cannot provide you with an endorsement that the use of this equipment will be safe nor can we state that the units will operate properly.

(Heyerdahl Aff. Ex. 14.) Kelly later wrote Rugh, stating that "Crafco has started a design project for the conveyor as we understand your requirements." (Id. Ex. 15.) Those requirements included a "powered conveyor that runs from the loading hatch on a[] . . . melter . . . . Sealant blocks will be able to be lined up on the conveyor and feed to the melter as needed. The loading hatch will be equipped with a splash resistant loading

tower that will automatically close as sealant blocks are dropped. The system will be able to be field installed on all the units presently owned by" Penn DOT. (Id.)

David Barnes, a newly hired Crafco employee, was given the task of creating a melter meeting Penn DOT's requirements. The parties hotly dispute what Barnes was told and by whom. Crafco contends that Barnes was simply asked to design a system to safely deliver sealant blocks into a melter and was never told how Penn DOT had been modifying its melters. (See Barnes Dep. Tr. at 14-15, 29, 42.) On the other hand, Cimline points to evidence, both direct and circumstantial, suggesting that Kelly provided information to Barnes about Penn DOT's modifications and how to develop a melter meeting its requirements. (See id. at 41-42; Brooks Dep. Tr. at 26-28.)

Regardless, Barnes set to the task of creating a melter with a conveyor system to deliver sealant blocks to the tank, along with a splash-proof box. In the course of doing so, he learned that Crafco had previously built melters with such systems. (Barnes Dep. Tr. at 42-44, 67-68; Heyerdahl Aff. Ex. 23.)[2] Its engineering department possessed drawings and pictures of those melters, which Barnes discovered sometime prior to August 4, 1997. (Barnes Dep. Tr. at 42-44; Heyerdahl Aff. Ex. 22.) Indeed, Crafco had sold melters with manual conveyor belts and splash-proof boxes to the Texas Department of Transportation during the 1980s, a fact Barnes learned before submitting the

_____

[2] That is consistent with Kelly's representation, in his October 3, 1996 letter to Allen, that Penn DOT's modifications were "similar to [a] design that Crafco has available." (Heyerdahl Aff. Ex. 14.)

application for the '375 patent.  (Schave Dep. Tr. 14-24; Barnes Dep. Tr. at 42-44, 67-68; Heyerdahl Aff. Ex. 23.)  He conveyed that information to Crafco's patent counsel.  (Id.)

On August 7, 1997, Barnes (through counsel) filed the '375 patent application; the Patent and Trademark Office ("PTO") granted the application and issued the '375 patent on October 19, 1999.  (See Kniser Decl. Ex. 1.)  In the background section, the patent recites how sealant melters work and discusses the splashing problem encountered by dropping sealant blocks into the reservoir tank.  (Id. col. 1, ll. 14-45.)  The only mention of the "prior art"[3] is the following:

> One prior attempted solution to this problem involved the use of an unpowered gravity-feed roller conveyor that led from the towing/storage vehicle to a receptacle on the sealant tank.  The receptacle took the form of a box having an inlet in one of its vertical sides.  The roller conveyor sloped downwardly from the towing/storage vehicle to the side inlet of the receptacle so that sealant blocks placed on its upper end slid by gravity into the side inlet of the receptacle.
>
> The sealant block feed assembly using an unpowered conveyor and a side-fed receptacle proved imperfect.  The receptacle may have helped reduce splashing, but its front or side inlet terminated so close to the inlet opening of the sealant tank that it could not assuredly prevent liquid sealant from splashing out of the sealant tank upon sealant block ingress.  Moreover, there was no practical way to arrest sealant block movement along the conveyor and hence no way to prevent sealant blocks from sliding into the receptacle once they were placed on the conveyor.  Sealant blocks therefore could not be

---

[3] The term "prior art" is found in 35 U.S.C. § 103(a):  "[a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made . . . ."  Prior art means "technology already available to the public.  [That is, technology] described in literature, including patents, or [that] has been publicly known or in . . . public use or on sale in this country. . . . [I]t is knowledge that is available, including what would be obvious from it, at a given time, to a person of ordinary skill in an art."  Kimberly-Clark Corp. v. Johnson & Johnson, 745 F.2d 1437, 1453 (Fed. Cir. 1984).

loaded in batches by a single operator and then subsequently fed one at a time into the sealant tank from curbside[,] but instead needed to be fed to the receptacle one at a time by an operator stationed on the vehicle.

(Id. col. 1, l. 46 – col. 2, l. 4.)  The recited prior-art contains no express reference to Penn DOT's modifications or the melters with manual conveyors Crafco had sold in the 1980s. (Brooks Dep. Tr. at 44-45; Barnes Dep. Tr. at 76-78.)  However, Crafco later submitted to the PTO a document listing several of its products as "other art," including an "assembly drawing for front loading conveyor package, Crafco Inc., 1985."  (Second Kniser Decl. Ex. 27 at 2.)[4]

The '375 patent discloses a sealant melter with a powered conveyor belt to move sealant blocks from the transport vehicle to the reservoir tank.  In addition, the described melter contains a "splash box" with hinged flaps mounted above the tank, through which sealant blocks pass when falling from the end of the conveyor into the tank.  According to Crafco, a powered conveyor with a splash-proof box had "never before been used on a sealant melter."  (Def. Mem. at 5.)

In June 2000, Crafco offered to sell its patented device to Cimline.  (Kniser Decl. Ex. 9.)  It received no response.  Later, in 2006, Cimline began offering to rent sealant melters with autoloaders to Penn DOT.  (Id. Ex. 14.)  After Crafco advised Cimline that its melters copied Crafco's patented technology (id.; Dunn Dep. Tr. at 75-76), Cimline made minor modifications to its melters in an attempt to design around the '375 patent.

---

[4] The document is signed by the PTO's patent examiner, indicating that this "other art" was considered before the patent issued.

Crafco was unsatisfied with those changes and continued to assert that Cimline's melter infringed.

Cimline then commenced the instant action. After Crafco filed a Motion to Dismiss, Cimline filed an Amended Complaint asserting four claims. Count I seeks a declaration that the '375 patent is invalid based on Crafco's prior use of melters with conveyor systems and splash-proof boxes and Penn DOT's public use of such melters. Count III seeks a declaration that even if the '375 patent is valid, Cimline's melter does not infringe. Count II (unfair competition) and Count IV (antitrust) are largely identical; each alleges that Crafco's use and threatened enforcement of an invalid patent amounts to improper conduct. Crafco answered the Complaint and counterclaimed for patent infringement.[5] Crafco now moves for summary judgment on each of Cimline's claims.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the

---

[5] Crafco has stipulated that the only claims in the '375 patent at issue are claims 4, 5, and 23, each of which relates primarily to the powered conveyor. (See Def. Mem. at 10.) Claim 4 describes a "sealant melter as defined in claim 1," which (in turn) describes a splash-proof box mounted above the reservoir tank and a conveyor system, "wherein said sealant block conveyor is a powered conveyor." Claim 5 describes a "sealant melter as defined in claim 4, further comprising" a manual on-off switch to power the conveyor. Finally, claim 23 describes a *method* of conveying sealant blocks into the reservoir tank using a powered conveyor, as described in claims 4 and 5. (See Kniser Decl. Ex. 1, col. 10, ll. 33-41, col. 16, ll. 13-20.)

material facts in the case are undisputed.  Id. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).[6]

---

[6] "The same standard of decision applies to a summary judgment motion on a patent claim as to other types of claims."  Med. Graphics Corp. v. SensorMedics Corp., Civ. No. 3-94-525, 1995 WL 523636, at *5 (D. Minn. June 2, 1995) (Kyle, J.) (citation omitted).

**ANALYSIS**

## I.    Invalidity

Count I seeks a declaration that the '375 patent is invalid, but it does not explain

the precise basis for that assertion – it states only that the patent is invalid "for failure to

satisfy the requirements of patentability" contained in Title 35 of the United States Code,

Sections 101, 102, and 103.  (<u>See</u> Am. Compl. ¶ 28.)  In its Memorandum in Opposition,

however, Cimline makes clear that it is relying on Section 102, which relates to public

uses and sales more than one year prior to the date of a patent application.  (<u>See</u> Mem. in

Opp'n at 26.)[7]

### A.    The law of invalidity and the on-use and public-sale bars

The '375 patent is presumed valid.  35 U.S.C. § 282.  Because of this presumption,

Cimline bears the burden of establishing invalidity by clear and convincing evidence.

<u>E.g.</u>, <u>Pfizer, Inc. v. Apotex, Inc.</u>, 480 F.3d 1348, 1359 (Fed. Cir. 2007); <u>Mas-Hamilton</u>

<u>Group v. LaGard, Inc.</u>, 156 F.3d 1206, 1216 (Fed. Cir. 1998).[8]  Under 35 U.S.C. § 102(b),

---

[7] Cimline also asserts that Crafco engaged in inequitable conduct before the PTO.  (<u>See</u> Mem. in Opp'n at 29-34.)  A patent may be invalidated on that basis.  <u>E.g.</u>, <u>Larson Mfg. Co. of S.D. v. Aluminart Prods. Ltd.</u>, 559 F.3d 1317, 1326 (Fed. Cir. 2009).  But nowhere in Count I does Cimline mention inequitable conduct as a basis for invalidating the patent.  (<u>See</u> Am. Compl. ¶¶ 24-28.)  Nor is it mentioned in Cimline's Memorandum when discussing Count I.  (<u>See</u> Mem. in Opp'n at 26-29.)  Accordingly, the Court will not consider inequitable conduct in connection with its analysis of invalidity.  Even if the Court were to do so, however, its analysis would not change, because Cimline has not proffered sufficient evidence to create a genuine issue that Crafco engaged in inequitable conduct.  (<u>See</u> <u>infra</u> at 28-32.)

[8] This Court must apply Federal-Circuit law to substantive patent-law questions.  <u>See, e.g.</u>, <u>Cimline, Inc. v. Crafco, Inc.</u>, Civ. No. 07-3997, 2007 WL 4591957, at *2 (D. Minn. Dec. 28, 2007) (Kyle, J.).

a patent is invalid if its subject matter was "in public use or on sale in this country more than one year prior to the date of the application for the patent." Accord Lisle Corp. v. A.J. Mfg. Co., 398 F.3d 1306, 1313 (Fed. Cir. 2005); Sonoscan, Inc. v. Sonotek, Inc., 936 F.2d 1261, 1264 (Fed. Cir. 1991). The on-sale and public-use bars arise out of the "reluctance to allow an inventor to remove existing knowledge" from the marketplace by asserting patent rights over an already public invention. Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 64 (1998).

Here, Cimline relies on (1) Crafco's sale of sealant melters with manual conveyors and splash-proof boxes in the 1980s and (2) Penn DOT's use of such melters, each more than one year prior to August 7, 1997 (the date of the patent application), to argue that the Section 102(b) bars apply. There can be no doubt that Crafco's prior sales and Penn DOT's modifications qualify as sales and public uses (respectively) within the ambit of Section 102(b). See, e.g., Am. Seating Co. v. USSC Group, Inc., 514 F.3d 1262, 1267 (Fed. Cir. 2008); In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 71 F.3d 1573, 1577 (Fed. Cir. 1995); Buildex Inc. v. Kason Indus., Inc., 849 F.2d 1461, 1464 (Fed. Cir. 1988).[9] Yet, the melters previously sold by Crafco and those used by Penn DOT differ from the melter described in the patent. In particular, the latter contains a powered conveyor system, while the former utilized manual or gravity-fed conveyors. In

---

[9] Whether a device is "on sale" or in "public use" more than a year prior to a patent application is a question of law, based on underlying facts. Am. Seating, 514 F.3d at 1267. Here, those underlying facts are undisputed.

other words, the patented "invention" is not precisely the same as the "invention" previously sold by Crafco or used by Penn DOT. On the surface, therefore, Cimline's claim of invalidity would appear to fail, because Section 102(b) invalidates a patent only where "the *invention* was . . . in public use or on sale" more than one year before a patent application. The analysis is not that simple, however.

## B.    Obviousness

While Section 102(b) bars patentability where a prior device and the patented device are the same,[10] it may also bar patentability "in conjunction with 35 U.S.C. § 103, if the claimed invention would have been obvious from the on-sale [or in-use] device in conjunction with the prior art." Med. Graphics Corp. v. SensorMedics Corp., Civ. No. 3-94-525, 1995 WL 523636, at *5 (D. Minn. June 2, 1995) (Kyle, J.) (quoting LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n, 958 F.2d 1066, 1071 (Fed. Cir. 1992)).[11] Stated differently, if "a device was in public use or on sale before the critical date, then that

---

[10] This is called "anticipation." See, e.g., Diversitech Corp. v. Century Steps, Inc., 850 F.2d 675, 677 (Fed. Cir. 1988). A prior device "anticipates" a later device where "every element of the claimed invention [is] identically shown in" the prior device. Id.; Med. Graphics Corp. v. SensorMedics Corp., Civ. No. 3-94-525, 1995 WL 523636, at *7 (D. Minn. June 2, 1995) (Kyle, J.). Cimline argues that the Crafco melters from the 1980s and Penn DOT's modified melters each anticipated the patented "autoloader." (Mem. in Opp'n at 26-27.) Yet, there is no dispute that the patented device differs from the earlier devices because it contains a powered conveyor system. Therefore, at least one element of the "claimed invention" cannot be "identically shown" in the earlier products. See Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991) (for patent to be invalid for anticipation, "[t]here must be *no difference* between the claimed invention and" the prior device) (emphasis added), overruled on other grounds, Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282 (Fed. Cir. 2009).

[11] Section 103, as noted above (see supra note 3), provides that a patent may not be obtained if the invention at issue would have been obvious to a person skilled in the relevant art.

device becomes a [prior art] reference under section 103 against the claimed invention."

LaBounty, 958 F.2d at 1071 (citation omitted).  The upshot, then, is as follows: if the

melters sold by Crafco in the 1980s or those modified by Penn DOT rendered obvious the

"autoloader" described in the '375 patent, then the patent must be declared invalid.[12]

Obviousness is a question of law, based on underlying factual inquiries.  E.g.,

Alza Corp. v. Mylan Labs., Inc., 464 F.3d 1286, 1289 (Fed. Cir. 2006).  These factual

inquiries include "(1) the scope and content of the prior art; (2) the level of ordinary skill

in the prior art; (3) the differences between the claimed invention and the prior art; and

(4) objective evidence of nonobviousness."  Id. at 1289.  Where there is no genuine issue

regarding the underlying facts, summary judgment "may be granted on the issue of

obviousness even though the ultimate legal conclusion of obviousness may be disputed

and even though some facts favor obviousness and some non-obviousness."  Semmler v.

Am. Honda Co., 990 F. Supp. 967, 974 (S.D. Ohio 1997) (citing Newell Cos. v. Kenney

Mfg. Co., 864 F.2d 757 (Fed. Cir. 1988)).

Here, Cimline has proffered almost no evidence regarding whether the subject

matter of the '375 patent would have been obvious to someone skilled in the art at the

time of patenting.  Indeed, it does little more than point to the products Crafco sold in the

1980s and Penn DOT's modifications and then assert, in a conclusory fashion, that the

---

[12] To be precise, obviousness does not invalidate an entire patent; rather, it invalidates
only those specific patent claims rendered obvious by the prior art.  See 35 U.S.C. § 253
("Whenever . . . a claim of a patent is invalid the remaining claims shall not thereby be rendered
invalid."); Diversitech Corp. v. Century Steps, Inc., 850 F.2d 675, 677 (Fed. Cir. 1988).

'375 patent must have been obvious in light of those products. It states (without citation to the record):

> The inventor, David Barnes, identified any number of instances of Prior Art which incorporated the limitations of the '375 Patent as to their inclusion of a conveyor and a splash box disposed above the opening into the sealant tank. These prior sales and uses render the Patent invalid under . . . the doctrine of obviousness.

(Mem. in Opp'n at 27.) This is insufficient to discharge Cimline's burden.

For example, as to the level of ordinary skill in the prior art, courts look at a multitude of factors, including "the various prior art approaches employed, the types of problems encountered in the art, the rapidity with which innovations are made, the sophistication of the technology involved, and the educational background of those actively working in the field." Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc., 707 F.2d 1376, 1382 (Fed. Cir. 1983). Cimline has nowhere addressed these factors, other than pointing to Crafco's earlier melters and Penn DOT's modifications. The Court has no idea, for instance, if other companies had been working in the field, what approaches such other companies may have taken to the problem of delivering sealant blocks into melters, the educational level of persons working for those companies, how quickly innovations (if any) were obtained, and the like. Similarly, objective indicia of nonobviousness include "commercial success, long felt but unsolved need for the invention, the failure of others, and copying of the claimed invention." Graham v. John

Deere Co. of K.C., 383 U.S. 1, 17 (1966).  The record is devoid of any evidence as to these factors.[13]

Cimline *has* offered an expert opinion that a powered conveyor added to a melter with a splash box would have been obvious to someone skilled in the art.  (See Kniser Decl. Ex. 25.)  Yet, the basis for that opinion is that powered conveyors have been available for a long time – it simply notes that "[c]onveyors are . . . nothing new in the industry nor are they a novel way to transport material" and that "[p]owering a conveyor is certainly nothing that has not been done in the past."  (Id. at 3-4.)  This opinion is entitled to little (if any) weight, because it "merely lists a number of prior art references and then concludes with the stock phrase 'to one skilled in the art it would have been obvious.'"  Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1373-74 (Fed. Cir. 2008); accord Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc., 183 F.3d 1347, 1356-57 (Fed. Cir. 1999).[14]  Similarly, the fact that replacing a manual conveyor with a powered one was a simple change does not render that change *per se* obvious.  See, e.g., In re Oetiker, 977 F.2d 1443, 1447 (Fed. Cir. 1992).  Indeed, that such a simple modification to sealant

---

[13] Cimline notes that Barnes, the listed inventor, is not an engineer.  (See Mem. in Opp'n at 13.)  But while "the educational level of the inventor may be a factor to consider in determining the level of ordinary skill in the art, it is by no means conclusive."  Orthopedic Equip. Co., 707 F.2d at 1382.

[14] Because the Court concludes that the expert's opinion does not alter its analysis, it need not address Crafco's argument that the opinion should be excluded under Federal Rule of Evidence 702.

melters was *not* made for at least a decade before the '375 patent was issued suggests that the change was not previously considered in the industry and was novel.[15]

Moreover, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 418 (2007); Innogenetics, 512 F.3d at 1373-74. Hence, the Court cannot reject the '375 patent for obviousness simply because powered conveyors have been in existence for decades. The focus instead must be on whether there existed "a reason that would have prompted a person of ordinary skill in the relevant field to combine" a powered conveyor with a sealant melter. KSR, 550 U.S. at 418; Innogenetics, 512 F.3d at 1374 (noting that expert must offer a "motivation for one skilled in the art to combine the particular [prior art] references he cites"); Pfizer, 480 F.3d at 1361 (party challenging validity must show "by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references relied on . . . to achieve the claimed invention"). Cimline does not even attempt to offer such a reason. And the Court must resist the temptation to look at the prior art with the benefit of hindsight, using the '375 patent "as an instruction manual or

---

[15] Cimline's expert opines that one of the melters Crafco sold in the 1980s did, in fact, use a powered conveyor. (See Kniser Decl. Ex. 25 at 3.) That assertion contradicts Cimline's own evidence, however. (See Schave Dep. Tr. at 18; Barnes Dep. Tr. at 67-68.) Indeed, if Crafco had sold melters with powered conveyors in the past, there would have been no reason for Cimline to argue obviousness – it would have simply asserted that the earlier devices were the same as the patented device. What the expert appears to be referring to is Crafco's use of a powered *actuator* to lift the entire conveyor belt up and down on its earlier models. (See id.) Obviously, that is different than a powered conveyor belt, as in the '375 patent.

'template' to piece together the teachings of the prior art so that the claimed invention is rendered obvious." In re Fritch, 972 F.2d 1260, 1266 (Fed. Cir. 1992); accord Winner Int'l Royalty Corp. v. Wang, 11 F. Supp. 2d 18, 24 (D.D.C. 1998) ("The standard of obviousness is not whether in hindsight, it seems elementary that someone would have combined . . . certain elements in the prior art to form the invention in question."), aff'd, 202 F.3d 1340 (Fed. Cir. 2000).

Lastly, Cimline overlooks a critical fact: Crafco disclosed to the PTO sketches of its melter with a splash-proof box and a manual conveyor system from the 1980s. (See supra at 8.) The '375 patent issued despite this prior art. Along with a patent's presumption of validity comes "a presumption of non-obviousness." Pfizer, 480 F.3d at 1359. And when the asserted prior-art basis for obviousness has been presented to and considered by the PTO, it is "especially difficult" to overcome the presumption. Hewlett-Packard Co. v. Bausch & Lomb Inc., 909 F.2d 1464, 1467 (Fed. Cir. 1990).

Simply put, Cimline has not proffered sufficient evidence to create a genuine issue that the patent is invalid for obviousness. The Court has been presented with nothing "more than the existence of the prior art . . . . Beyond that, we have no evidence on either side explaining [its] teachings, which [is] not clearly evident simply upon re[viewing] the [prior art]." Cooper v. Ford Motor Co., 748 F.2d 677, 679 (Fed. Cir. 1984).

To recap: sales or public uses more than a year prior to a patent application can bar patentability in one of two ways. Such bars apply *directly* when the prior sales/uses involve precisely the same product as the later-patented one, or *indirectly* where the prior

sales/uses would render the patented device obvious. Neither has been shown on the record before the Court here. Accordingly, Cimline has not satisfied its burden of creating a genuine issue of fact concerning invalidity, and Crafco's Motion will be granted with respect to Count I, which will be dismissed.

## II. Infringement

In Count III, Cimline seeks a declaration that its melter does not infringe the '375 patent. Crafco moves for summary judgment on this claim, arguing that there is no genuine issue that Cimline's melter infringes claims 4, 5, and 23.[16]

### A. The law of infringement

To determine whether a patent claim has been infringed, a court must engage in a two-step analysis. First, it must determine, "as a matter of law, the correct claim scope." Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 988 (Fed. Cir. 1999). Second, it must compare the properly-construed claim to the accused device to determine whether each claim limitation is found therein. Id. Generally speaking, the second step is for the fact-finder. E.g., DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 469 F.3d 1005, 1013 (Fed. Cir. 2006); Insituform Techs., Inc. v. Cat Contracting, Inc., 161 F.3d

---

[16] Curiously, Crafco did not cross-move for summary judgment on its infringement counterclaim. Nevertheless, the Court may grant summary judgment on the counterclaim *sua sponte*, since it is the flip side of Cimline's non-infringement coin. See, e.g., Madewell v. Downs, 68 F.3d 1030, 1049 (8th Cir. 1995) (court may grant summary judgment *sua sponte* where party's "right to summary judgment turn[s] on [an] issue" already addressed in connection with other summary-judgment motion); Chrysler Credit Corp. v. Cathey, 977 F.2d 447, 449 (8th Cir. 1992) (where party is afforded opportunity to present evidence on legal issue at summary judgment, court may grant judgment *sua sponte* on claim turning on same issue).

688, 692 (Fed. Cir. 1998). But the Court may decide this issue at summary judgment if it concludes that no genuine issue of fact exists. See, e.g., TechSearch, L.L.C. v. Intel Corp., 286 F.3d 1360, 1369 (Fed. Cir. 2002); Amhil Enters. Ltd. v. Wawa, Inc., 81 F.3d 1554, 1557-58 (Fed. Cir. 1996). Indeed, courts routinely grant summary judgment and find infringement as a matter of law where there is no factual dispute on the infringement question. See, e.g., Elantech Devices Corp. v. Synaptics, Inc., No. C 06-1839, 2008 WL 2008627 (N.D. Cal. Apr. 12, 2008); BASF Agrochemical Prods. v. Unkel, No. 05 CV 1478, 2006 WL 3533133 (W.D. La. Dec. 7, 2006); Cytomedix, Inc. v. Little Rock Foot Clinic, P.A., No. 02 C 4782, 2004 WL 1921070 (N.D. Ill. Aug. 4, 2004); Quantachrome Corp. v. Micromeritics Instrument Corp., 37 F. Supp. 2d 1354 (S.D. Fla. 1999).

An accused device may infringe a patent claim in one of two ways. First, it may "literally infringe," meaning that every limitation in the claim is found in the accused device. See, e.g., Enercon GmbH v. Int'l Trade Comm'n, 151 F.3d 1376, 1384 (Fed. Cir. 1998). Put another way, "literal infringement . . . requires [a] plaintiff to prove each and every claim element is present in the accused device. *Any* deviation precludes a finding of literal infringement." Nonin Med., Inc. v. Konica Minolta Photo Imaging U.S.A., Inc., 381 F. Supp. 2d 1069, 1078 (D. Minn. 2005) (Rosenbaum, J.) (emphasis added) (citations omitted); accord, e.g., Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 934 (Fed. Cir. 1987) (*en banc*) (no literal infringement if "the required function is not performed *exactly* in the accused device") (emphasis in original), abrogated on other grounds, Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83 (1993).

Second, if an accused device does not literally infringe, it may infringe under the "doctrine of equivalents." Under that doctrine, the question is whether there exists "'equivalence' between the elements of the accused product . . . and the claimed elements of the patented invention." Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997); accord, e.g., Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 812 (Fed. Cir. 2002) ("Infringement under the doctrine of equivalents requires the patentee to prove that the accused device contains an equivalent for each limitation not literally satisfied."). There are strong public-policy reasons underpinning the doctrine of equivalents:

> The language in [a] patent . . . may not capture every nuance of the invention or describe with complete precision the range of its novelty. If patents were always interpreted by their literal terms, their value would be greatly diminished. Unimportant and insubstantial substitutes for certain elements could defeat the patent, and its value to inventors could be destroyed by simple acts of copying.

Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 731 (2002); accord, e.g., Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 607 (1950) ("[T]o permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing.").

**B.      Does Cimline's melter infringe?**

With regard to claim construction, the first step in the infringement analysis, the parties dispute the proper scope of claims 4, 5, and 23; their disagreement focuses on the "splash box."  As noted above (see supra note 5), claims 4, 5, and 23 incorporate by reference claim 1 of the patent, which describes a splash box "disposed above [the] inlet opening of [the] sealant tank, said splash box having an upper splash box inlet and having a lower splash box outlet disposed above [the] inlet opening of said sealant tank."  (Kniser Decl. Ex. 1, col. 10, ll. 9-12.)  Crafco contends that, despite the description in claim 1 of a splash box mounted completely above the sealant tank, the term "splash box" may be read expansively to include any "box that contains hot sealant that splashes out of the tank," no matter its shape or location.  (See Def. Mem. at 11-12.)  Cimline, on the other hand, argues that the "splash box" is limited by the description in claim 1 and must be disposed completely above the inlet opening of the sealant tank – that is, the bottom of the splash box must be completely above the opening in the top of the sealant tank.  (See Mem. in Opp'n at 22.)  For present purposes, the Court will adopt Cimline's narrower claim construction, because it concludes that its melter nevertheless infringes claims 4, 5, and 23 of the '375 patent.

There is no dispute that Cimline's melter incorporates nearly all of the elements of the patented one, including a powered conveyor to transport sealant blocks from a storage vehicle and a splash box through which those blocks pass when falling between the end

of the conveyor and the reservoir tank. Cimline contends that its melter does not infringe, however, because its splash box terminates slightly below the top of the sealant tank:

> Cimline's product does not include a lower splash box outlet located completely above the inlet opening of the sealant tank. The receptacle in Cimline's design is comprised of the four continuous steel walls of the chute,[17] the bottoms of which are angled inward. No additional or extraneous material is added to the chute, it is simply a different design *and is mounted such that the bottom of the receptacle is below the inlet opening of the sealant tank.* These angled ends extend below the top of the sealant tank and even go below the bottom surface of the top structure of the sealant tank (an insulated deck).

(Mem. in Opp'n at 23 (emphasis added).) This argument fails to pass muster.

It is true that, under the claim construction adopted above, Cimline's melter does not literally infringe. This is because one of the elements of claims 4, 5, and 23 – a splash box disposed completely *above* the top of the sealant tank – is not found in Cimline's melter, in which the splash box terminates *below* the top of the sealant tank. See Nonin, 381 F. Supp. 2d at 1078 ("*Any* deviation precludes a finding of literal infringement.") (emphasis added).

Nevertheless, the Court determines that there is no genuine issue as to whether Cimline's melter infringes under the doctrine of equivalents. The *only* asserted difference between the splash box on Cimline's melter and the splash box described in the '375 patent is that the bottom of the former angles inward and extends a few inches below the top of the sealant tank. Yet, Cimline has left unrebutted Crafco's assertion that these

---

[17] Cimline calls the splash box on its melter a "chute," but it is clear that it is nothing more than a box "composed of four sheets of steel joined at their edges." (Mem. in Opp'n at 26.)

minor changes add no functionality to the splash box and "certainly do[] not contain liquid that has splashed out of the tank."  (Def. Mem. at 13; <u>see also</u> Kniser Decl. Ex. 18 ¶¶ 20-23 (Crafco's expert opining that Cimline's changes add no functionality to the splash box).)  Indeed, the supplier of Cimline's accused product admits that it bent the bottom of the splash-box walls solely to design around the '375 patent and for no other functional reason.  (<u>See</u> Stepp Dep. Tr. at 66-67.)  And Rick Stoffels, Cimline's design engineer, confirms that the "flanges" at the bottom of its splash-box walls were <u>not</u> added to enhance safety or help secure the splash box to the sealant tank, but rather to "change the way th[e] chute and its opening [are] . . . mounted in relation to the opening of [the] melter tank" to try to avoid the '375 patent.  (<u>See</u> Stoffels Dep. Tr. at 43.)[18]  Simply put, Cimline offers no argument that the modified design of its splash box, with bent "flanges" at the bottom, does anything different than the splash box described in the '375 patent in any significantly different way.

Under the doctrine of equivalents, an accused device infringes a claim in a patented device if it "performs substantially the same function in substantially the same way to obtain the same result." <u>Catalina Mktg.</u>, 289 F.3d at 812 (quoting <u>Graver Tank</u>, 339 U.S. at 608).  That is true here.  The splash box on Cimline's melter performs the same function and obtains the same result as the splash box described in claim 1 of the '375 patent:  it contains sealant splashes.  And the two splash boxes perform that function

---

[18] Stoffels refers to the bent bottom of the splash box's sidewalls as "flanges."  (Stoffels Dep. Tr. at 43.)

and achieve that result in substantially the same way. That Cimline's splash box is bent at the bottom and extends slightly past the top of the reservoir tank does not change that fact. (See Kniser Decl. Ex. 18.) Cimline has proffered no expert testimony or other evidence that its splash box functions any differently than Crafco's or that its changes to the bottom of the box are material for any reason. Accordingly, the Court concludes, as a matter of law, that Cimline's melter is equivalent to the one described in claim 1 of the '375 patent and, as a result, infringes the dependent claims asserted here (claims 4, 5, and 23).

Notably, Cimline nowhere argues that its splash box performs differently than the patented one or that its minor changes are material in any way under the doctrine of equivalents. However, it *does* argue that the doctrine of equivalents is inapplicable because by concluding its splash box is equivalent to the one described in claim 1, the Court would effectively read the limitation "disposed above [the] inlet opening of [the] sealant tank" out of that claim. (See Def. Mem. at 24 ("Interpreting Crafco's claim term 'above' to include its opposite 'below' would completely vitiate that claim term.").) In support of its argument, it relies on the rule of "claim vitiation." In essence, that rule requires a court not to expand the doctrine of equivalents so broadly that a determination of equivalency "would entirely vitiate" one of the patent's claims. E.g., Lockheed Martin Corp. v. Space Systems/Loral, Inc., 324 F.3d 1308, 1321 (Fed. Cir. 2003).

But the claim-vitiation rule is best understood as part of the initial determination whether there is a substantial difference between an element of the accused device and the

patent claim at issue.  E.g., Nystrom v. Trex Co., 580 F.3d 1281, 1287 (Fed. Cir. 2009) (Rader, J., expressing additional views).  "[A] finding of insubstantial difference to show equivalency obviates any further vitiation analysis – the wholly insignificant equivalent, by definition, would not vitiate the claim.  On the other hand, a finding of substantial difference renders vitiation unnecessary.  Thus, the vitiation doctrine is really subsumed within the test for equivalents itself.  In other words, the . . . rule is simply a circular application of the doctrine of equivalents."  Id.; accord, e.g., DePuy Spine, 469 F.3d at 1018-19 ("A holding that the doctrine of equivalents cannot be applied to an accused device because it 'vitiates' a claim is nothing more than a conclusion that the evidence is such that no reasonable jury could conclude that an element of an accused device is equivalent to an element called for in the claim.").

    For this reason, the Court concludes that the claim-vitiation rule is inapplicable here.  The differences between Cimline's splash box and the splash box described in claim 1, as set forth above, are *de minimis* and do not affect functionality in any way.  It is not enough that Cimline's splash box is shaped differently than Crafco's.  See Graver Tank, 339 U.S. at 608 ("[I]f two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, *form or shape*.") (emphasis added); Optical Disc Corp. v. Del Mar Avionics, 208 F.3d 1324, 1337 (Fed. Cir. 2000) (noting that the claim-vitiation rule "does not stand for the proposition that a claim limitation describing a specific shape of a claimed structure cannot be infringed under the doctrine of equivalents by a differently shaped structure").

The bottom flanges on Cimline's splash box are merely "a subtle difference in degree, not a clear, substantial difference or difference in kind" from the splash box described in claim 1. <u>Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.</u>, 149 F.3d 1309, 1321 (Fed. Cir. 1998). And where, as here, a "specific shape described in a patent merely teaches [a] function" – in this case, preventing sealant splashes – "an accused device that performs substantially the same function in substantially the same way to achieve substantially the same result justifies finding infringement under the doctrine of equivalents and does not violate the [claim-vitiation] rule." <u>ACLARA BioSciences, Inc. v. Caliper Techs. Corp.</u>, No. C 99-1968, 2000 WL 1639507, at *12 (N.D. Cal. Oct. 27, 2000).[19]

At the end of the day, the law "forbids not only exact copies of an invention, but [also] products that go to the heart of an invention but avoid[] the literal language of the [patent's] claim[s] by making a noncritical change." <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 373 (1996) (internal quotation marks and citation omitted). The doctrine of equivalents "prevents an accused infringer from avoiding infringement by changing minor details of a claimed invention while retaining its essential functionality." <u>ACLARA BioSciences</u>, 2000 WL 1639507, at *7. That is precisely the case here, based

---

[19] To be sure, the Federal Circuit has not painted a clear picture of the claim-vitiation rule and the doctrine of equivalents. <u>See, e.g.</u>, <u>ACLARA BioSciences</u>, 2000 WL 1639507, at *10 (noting that "Federal Circuit cases do not provide much guidance" on the issue). Cimline has cited cases, such as <u>Sage Products, Inc. v. Devon Industries, Inc.</u>, 126 F.3d 1420 (Fed. Cir. 1997), that could be read to suggest the claim-vitiation rule should apply here. (<u>See</u> Mem. in Opp'n at 23-25.) Nevertheless, the Court concludes that its interpretation and application of the doctrine of equivalents and the claim-vitiation rule are correct, in light of the case law set forth above.

on the record before the Court.  Accordingly, the Court will grant Crafco's Motion *vis-a-vis* Cimline's claim for a declaration of non-infringement (Count III), and it will *sua sponte* grant summary judgment to Crafco on its infringement counterclaim.[20]

## III.    Unfair Competition and Antitrust

Counts II (unfair competition) and IV (antitrust) are closely related.  Each asserts that Crafco engaged in inequitable conduct before the PTO to obtain a knowingly invalid patent, "in order to gain an unfair competitive advantage" in the marketplace.  (Am. Compl. ¶ 30; accord id. ¶ 42; see also Mem. in Opp'n at 33 (arguing that Crafco's allegedly inequitable conduct "underlies and supports Cimline's causes of action based on antitrust and unfair competition violations").)  Crafco argues that these claims falter because Cimline has failed to create a genuine issue that its actions before the PTO amounted to inequitable conduct.  The Court agrees.

A patent applicant engages in inequitable conduct if, "with intent to mislead or deceive the examiner, [it] fails to disclose material information or submits materially false information to the PTO during prosecution."  Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd., 559 F.3d 1317, 1326 (Fed. Cir. 2009).  To prove inequitable conduct here, Cimline must present evidence that Crafco "(1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]. "  Id. (internal quotation marks and

---

[20] The Court's *sua sponte* grant of summary judgment is limited to Cimline's liability for infringement.  The amount of damages, if any, to which Crafco is entitled must await trial.

citations omitted).  Information allegedly withheld from the PTO must be material for inequitable conduct to exist.  Id.  And materiality must be shown by clear and convincing evidence.  Id.

Information is material when a reasonable patent examiner would consider it important in deciding whether to grant the patent application.  Id.  Withheld information need not automatically invalidate the patent in order to be material.  Id. at 1327. Nevertheless, information is not material "if it is merely cumulative to, or less relevant than, information already considered by the examiner."  Id.

The Court concludes that Cimline has not shown, by clear and convincing evidence, that the information Crafco allegedly withheld from the PTO was "material." Cimline points to Crafco's undisclosed sales of melters with conveyors and splash boxes in the 1980s and Penn DOT's modifications more than a year before the patent application.  Yet, Cimline ignores that Crafco *did* disclose to the PTO the design of its prior melters with manual conveyor belts and splash boxes.  (See supra at 8.)[21]  And while Crafco did not disclose Penn DOT's modifications, those modifications rendered Penn DOT's melters substantially similar to the disclosed ones.  The Penn DOT modifications, therefore, were merely cumulative of information already before the PTO.

---

[21] The prior-art section of the '375 patent also recites the industry's previous use of melters with splash boxes and conveyors, a fact inconsistent with an attempt by Crafco to mislead the PTO.

It is also true that Crafco failed to disclose that it previously *sold* melters with these features and that they were in *public use* more than a year before the patent application.  But even if such information were material, Cimline has not proffered clear and convincing evidence that Crafco withheld it with the intent to deceive the PTO.  It is not enough for Cimline to simply point to withheld information in order to establish intent.  See, e.g., Larson Mfg., 559 F.3d at 1340 ("[N]ondisclosure, by itself, cannot satisfy the deceptive intent element.").  Rather, intent to deceive requires evidence that the patent applicant knew of the importance of the withheld information but consciously chose not to disclose it.  See, e.g., Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008) ("In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a *deliberate decision* to withhold a *known* material reference.") (emphasis in original) (citation omitted); Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1227 (Fed. Cir. 2006) (intent to deceive "is a subjective inquiry into whether the inventor knew the information was material and chose not to disclose it").

Here, Cimline asserts that Kelly and Donald Brooks, a Crafco co-owner, withheld the information regarding prior sales and Penn DOT's modifications.  Yet, there is nothing in the record to indicate that these individuals knew the importance of such information or how such prior sales/uses would impact patentability.[22]  Cimline also

---

[22] Cimline argues that Brooks was aware the information "needed to be disclosed" (Mem. in Opp'n at 30), but it cites no evidence in the record to support that assertion.

asserts that Barnes knew about the prior sales and failed to disclose them, but his unrebutted testimony is that he disclosed the prior sales to Crafco's patent counsel, who prepared the patent application. (Barnes Dep. Tr. at 67-68; Heyerdahl Aff. Ex. 23.) Finally, Cimline points out that Floyd Schave, another Crafco co-owner, knew about both the prior sales and the patent-application process and, accordingly, should have disclosed the prior sales to the PTO. (Mem. in Opp'n at 29-30.) But only individuals "associated" with the filing and prosecution of a patent application have a duty to disclose. 37 C.F.R. § 1.56(a). This includes the inventor; attorneys or agents who prepare or prosecute the patent application; and "[e]very other person who is substantively involved in the preparation or prosecution of the application." Id. § 1.56(c)(1)-(3). There is simply no evidence in the record that Schave had any involvement in the preparation or prosecution of the '375 patent application – all the record discloses is that he gave Barnes the task of designing a melter with a conveyor system meeting Penn DOT's needs. (Brooks Dep. Tr. at 25-26.)[23] Nothing suggests that he knew (or intended) the end result of the project would be patented. In fact, Barnes testified that Schave was so angry after Barnes was hired for this project that Schave did not speak to him for several years thereafter. (Barnes Dep. Tr. at 34-35, 104.)

In the Court's view, the record does not contain evidence sufficient to create a genuine issue, and certainly falls far below clear and convincing evidence, that

---

[23] There is a similar dearth of evidence that Kelly and Brooks were involved in the preparation or prosecution of the patent application.

information was withheld from the PTO with the intent to deceive. Accordingly, Cimline has failed to show inequitable conduct – the foundation upon which its unfair-competition and antitrust claims rest – and these claims must fail.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Crafco's Motion for Summary Judgment (Doc. No. 52) is **GRANTED** and Cimline's Amended Complaint (Doc. No. 14) is **DISMISSED WITH PREJUDICE**. It is further **ORDERED** that summary judgment is **GRANTED** to Crafco *sua sponte* with respect to Cimline's liability on Crafco's counterclaim (Doc. No. 29). For the sake of clarity, all that remains for trial is a determination of the appropriate amount of damages, if any, to which Crafco is entitled on its counterclaim.

Dated: December 2, 2009

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge